**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 20-cv-62172-BLOOM**

MAURICE EXAVIER,

     Petitioner,

v.

UNITED STATES OF AMERICA,

     Respondent.

_____/

## ORDER DENYING MOTION TO VACATE

**THIS CAUSE** is before the Court upon Petitioner Maurice Exavier's ("Petitioner") Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody. ECF No. [1] ("Motion"). The Government filed a Response to the Motion, ECF No. [9] ("Response"), with supporting exhibits, ECF Nos. [9-1], [9-2], [9-3], [9-4], [9-5], [9-6], [9-7], [9-8], [9-9], [9-10], [9-11], [9-12], [9-13], [9-14], [9-15], [9-16], [9-17], [9-18]. Petitioner filed a Reply, ECF No. [13] ("Reply"), with a supporting exhibit, ECF No. [13-1]. The Court has carefully considered the Motion, all opposing and supporting submissions, the record in this case, the applicable law, and is otherwise fully advised. For the reasons set forth below, the Motion is denied.

## I.  BACKGROUND

Petitioner, who is presently incarcerated at the Miami Federal Correctional Institution, asks the Court to vacate, set aside, or correct his sentence in case no. 16-cr-6007. *See generally* ECF No. [1]. The Court construes Petitioner's Motion liberally due to his *pro se* status. *See Haines v. Kerner*, 404 U.S. 519, 520-21 (1972).

Petitioner and his two co-defendants, Carline Maurice and Jimmy Alexandre, were charged by Indictment with 22 separate counts. CR-ECF No. [3].[1] Petitioner was charged with conspiracy to commit wire fraud in violation of 18 U.S.C. §§ 1343 and 1349 (Count 1), conspiracy to commit identity fraud in violation of 18 U.S.C. §§ 1028(f) and 1028(a)(7) (Count 2), 15 counts of wire fraud in violation of 18 U.S.C. § 1343 (Counts 3-17), and 5 counts of aggravated identity theft under 18 U.S.C. § 1028A (Counts 18-22). *Id.* at 1-11.

***The Offense Conduct and Trial.*** The Eleventh Circuit previously summarized the background offense conduct and trial as follows:

> Exavier and Maurice were principals of Broward Financial Services, LLC ("BFS"), Advance Tax and Accounting Services, Inc. ("ATAS"), and Advance Tax and Accounting Services 2 ("ATAS2"). All three companies provided tax preparation services. Alexandre worked as a tax preparer for a separate business called "Mr. Cash and Associates" ("Mr. Cash"). The government alleges that through these businesses, defendants arranged to file false tax returns on behalf of deceased individuals and have refund checks deposited into bank accounts that Exavier and Maurice controlled.

> To facilitate electronic filing, the Internal Revenue Service ("IRS") assigns individual tax preparers a Preparer Tax Identification Number ("PTIN"). Similarly, the IRS assigns tax preparation businesses an Electronic Filing Identification Number ("EFIN"). Both the EFIN and PTIN are specific to that business or individual, and cannot be transferred or reassigned. When a tax preparation business files an electronic return, it must include both the EFIN for the business and the PTIN for the individual tax preparer.

> In 2003, the IRS issued an EFIN to BFS. In March of 2008, the IRS issued a PTIN to Exavier so that he could file tax returns for BFS clients. In 2009, in addition to tax preparation services, BFS obtained a state license as a money services business to offer check cashing services for tax preparation clients. The EFIN for BFS became inactive in November of 2010, and the IRS suspended its authorization to file tax returns electronically.

> In July of 2010, Exavier and Maurice established ATAS, with Maurice as president and Exavier as vice president. The IRS issued an EFIN to ATAS. On September 10, 2010, a Florida corporation called The Tax Doctors of Broward County reorganized to become ATAS2, with the same business address as ATAS. On September 30, 2010, the IRS issued an EFIN to ATAS2.

---

[1] References to docket entries in Petitioner's criminal case, No. 16-cr-60007, are denoted as "CR-ECF No."

In early 2011, ATAS electronically filed 158 income tax returns seeking $536,430 in refunds for deceased individuals. In this same period, ATAS2 electronically filed 312 returns for deceased individuals claiming $1,069,752 in refunds. All of these refunds were filed under EFINs for ATAS and ATAS2 and Maurice's PTIN. Each return included the correct name, birth date, and social security number of the decedent, but listed false information regarding employment, income, contact information, tax credits, deductions, and dependents. The IRS did not actually owe refunds on any of these returns.

In transactions involving a paid tax preparer, a taxpayer can direct the IRS to deposit the refund in the bank account of a designated third party. The third party pays the tax preparer directly, then deducts a processing fee and pays the balance to the taxpayer. ATAS and ATAS2 used Santa Barbara Tax Products Group ("SBTPG") to process refunds and pay tax preparation fees. SBTPG sent blank checks to ATAS and ATAS2 and when it received refunds from the IRS, authorized them to print cashier's checks for the taxpayers. The government claimed that defendants used this arrangement so that Maurice and Exavier could deposit refund checks for deceased individuals into accounts which they controlled.

On January 19, 2011, after reviewing nine tax returns that had been filed for deceased individuals under the ATAS EFIN, SBTPG terminated its relationship with ATAS. Other than a few refund checks that issued before it discovered the fraud, SBTPG did not actually issue refunds for the fraudulent returns that ATAS and ATAS2 had filed. SBTPG did deposit tax preparation fees into their bank accounts, however, with ATAS receiving approximately $54,457 and ATAS2 receiving $245,569. Of the $54,457 which ATAS received, $4,000 was traced to Maurice and $2,000 to Exavier, with the balance largely used to pay "1099 commissions" to various unspecified individuals. Of the $245,569 which ATAS2 received, $10,000 was transferred to Maurice through checks, $59,000 was transferred to Exavier through checks, $5,000 was transferred to a BFS bank account, and nine checks totaling $20,350 were made payable to cash. The balance apparently remained in the ATAS2 account or was not directly traceable to defendants.

Alexandre worked as a tax preparer for Mr. Cash in early 2011. He received permission from the company's owner, Yanel Laroche, to file electronic tax returns for his "friends," *i.e.*, tax preparers who had lost their EFINs but who nevertheless wished to service some 1,000 clients. Between January 28 and March 3, 2011, Alexandre filed 363 tax returns electronically under Mr. Cash's EFIN and his own PTIN. Of those 363 tax returns, 345 sought refunds amounting to $1,708,910 in the names of deceased individuals. Like the fraudulent returns which ATAS and ATAS2 filed, Alexandre's returns contained the correct names, birth dates, and social security numbers of the decedents, but listed false information regarding employment, income, contact information, tax credits, deductions, and dependents. For Alexandre's returns, Mr. Cash used SBTPG to process refunds and pay tax preparation fees. In March of 2011, SBTPG contacted Laroche to alert him that tax

returns had been filed for "dead people" under Mr. Cash's EFIN. Laroche discovered that Alexandre had prepared all of those tax returns. When SBTPG detected the fraud, it had already authorized checks for many of the refunds claimed in those returns. Among them, SBTPG had authorized $555,939 in refunds on 161 checks that were printed in the Mr. Cash office and deposited into a BFS business checking account that listed Exavier and Maurice as authorized signatories. Alexandre, who did not have a physical office at Mr. Cash, was the only individual who had picked up refund checks that SBTPG issued for the fraudulent returns. SBTPG paid $965,585 in refunds that the IRS funded for the 345 fraudulent tax returns that Alexandre prepared in early 2011.

Approximately 97 percent of the checks deposited into the BFS business checking account in the first quarter of 2011 were tax refund checks. At trial, IRS Special Agent Bradley Cohen testified that in addition to the 161 refund checks related to Alexandre's returns, BFS deposits included 491 refund checks totaling $1,785,683 from returns filed by tax preparers other than defendants, ATAS, ATAS2, or Mr. Cash. Of this amount, $639,610 was transferred to another BFS account which listed Maurice and Exavier as signatories. From that account, checks totaling $57,250 were paid to Maurice, $40,500 to Exavier, $19,000 to Exavier's wife, $4,000 to ATAS, and $360,298 to cash. Of the checks made payable to cash, $28,000 was traced to a joint account that belonged to Exavier and his wife. Agent Cohen did not opine on the legitimacy of all of the refund checks from other tax preparers, but he analyzed 100 of the 491 refunds. He found that more than 60 of the refund checks were for deceased individuals and that 18 of them were for incarcerated individuals, two of whom were serving life terms.

Agent Cohen testified that documents from the Office of Financial Regulation had listed BFS as a check cashing and money transmitter business. Agent Cohen testified that in November of 2009, when Exavier applied for a Florida business license, he represented that his check cashing operation was limited to cashing checks for tax clients. Agent Cohen testified that in February of 2012, when he went to visit the principal place of business which BFS listed on its annual report, he did not see any sign which represented that check cashing services were offered there. Agent Cohen testified that from 2010 through 2016, BFS moved several times to and from the most recent address on record with the State of Florida (2033 University Drive, Sunrise, Florida) and where ATAS and ATAS2 were located (930 and 938 N.E. 62 Street, Oakland Park, Florida).

Agent Cohen further testified that some checks on the bank account of Exavier and his wife had been made payable to "Antonio Duval." Other checks drawn on a BFS account were payable to the same individual. Agent Cohen never investigated Duval and did not know how much cash he received from Exavier. Exavier did not testify at trial. Through counsel, he maintained that he had a legitimate check cashing operation and that perhaps a teller, Duval, or someone else had cooperated with Alexandre in the fraudulent scheme. Exavier's counsel argued that the government's investigation was incomplete because it did not sufficiently investigate the signatures on various documents, the actual sender or recipient of

various email communications, or the unidentified recipients of large amounts of money from refund checks and tax preparation fees.

Maurice also did not testify. Through counsel, she suggested that someone had forged her signature, established bank accounts in her name, and used her PTIN without her knowledge. A handwriting expert testified that "she didn't write the signature on certain of the documents that were submitted" and that as to other documents, his findings were "inconclusive." The expert eliminated Maurice as the signatory on three documents, including two checks, but he could not eliminate her as the person who signed the remaining documents.

At trial, Alexandre testified that he had met a man named "Crazy C," who told him that he and his partners had a tax return preparation business with more than 1,000 clients, but that the business had lost its EFIN. In return for part of the tax preparation fees, Crazy C gave Alexandre information on his clients so that Alexandre could prepare their tax returns for 2010. Alexandre testified that Laroche gave him permission to file the returns through Mr. Cash. Alexandre accepted tax return files from Crazy C and filed the returns electronically under Mr. Cash's EFIN. Alexandre claimed that when he accepted tax returns from Crazy C, he did not know they were for deceased individuals. Alexandre testified that he had no intent to defraud anyone and that he had not conspired with Exavier or Maurice to file fraudulent tax returns. Alexandre testified that he had no idea how tax refund checks ended up in BFS bank accounts because he had simply picked up the checks at Mr. Cash's offices and given them to Crazy C.

*United States v. Exavier*, 783 F. App'x 849, 852-55 (11th Cir. 2019). At the conclusion of the 10-day trial, the jury found Petitioner and his co-defendant Maurice guilty on all twenty-two counts. CR-ECF No. [187] at 55-57. Alexandre was acquitted on all counts. *Id.* at 57-58. At sentencing, Petitioner addressed the District Court at length and maintained his innocence. CR-ECF No. [188] at 26-30. Petitioner was sentenced to a total of 145 months imprisonment, 121 months as to each of Counts 1 through 17, to be served concurrently, and 24 months as to each of Counts 18 through 22, to be served concurrently with each other and consecutively to Counts 1 through 17. CR-ECF No. [134] at 2.

***Appeal and Post-conviction Proceedings***. Petitioner, through counsel, filed an appeal which was consolidated with co-defendant Maurice's appeal. *See United States v. Exavier*, 783 F. App'x 849, 852 (11th Cir. 2019). Petitioner raised five issues, arguing that: (1) the evidence was

insufficient to support his conviction; (2) a new trial was warranted because the Government failed to disclose certain information and presented false testimony; (3) the District Court erred when it refused to give a jury instruction on multiple conspiracies; (4) the District Court erred when it admitted evidence of another crime under Rule 404(b) of the Federal Rules of Evidence; and (5) the District Court erred when it imposed various sentencing enhancements. *Id.* The first two arguments were raised jointly, but Petitioner raised the last three arguments individually. *Id.* On July 30, 2019, the Eleventh Circuit issued a written opinion affirming the convictions. *Id.* at 868.

***The § 2255 Proceedings***. Petitioner timely[2] filed his Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody, an Addendum to the Motion, and an Affidavit. *See* ECF Nos. [1], [1-1], [1-2].[3] The Government filed a Response and exhibits opposing Petitioner's requested relief. ECF Nos. [9], [9-1], [9-2], [9-3], [9-4], [9-5], [9-6], [9-7], [9-8], [9-9], [9-10], [9-11], [9-12], [9-13], [9-14], [9-15], [9-16], [9-17], [9-18]. Petitioner filed a Reply and an exhibit. ECF Nos. [13], [13-1]. On March 15, 2021, Petitioner filed a Motion to Expand the Record, asking the District Court to expand the record to "encompass both (1) the report from Private Investigator Reilly, as it substantiates the claims from his § 2255 motion, and (2) the affidavit of Antonio Duval, as it also verifies the § 2255 motion's claims." ECF No. [14] at 1. Both documents were filed with the Motion to Expand the Record. *Id.* at 3-8. The District Court granted the Motion "solely to the extent that affidavit and exhibits attached to the Motion [to Expand the Record] will be considered by this Court in conjunction with Petitioner's § 2255 Motion." ECF No. [15] at 1 (alterations added).

---

[2] "Under the prison mailbox rule, a *pro se* prisoner's court filing is deemed filed on the date it is delivered to prison authorities for mailing." *Williams v. McNeil*, 557 F.3d 1287, 1290 n.2 (11th Cir. 2009) (citations and internal quotation marks omitted).

[3] On November 3, 2020, Petitioner filed a verification that the Addendum he filed was true and correct and filed under penalty of perjury. ECF No. [6].

## II. LEGAL STANDARD

*Section 2255 Motions*. "A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution . . . may move the court which imposed the sentence to vacate, set aside, or correct the sentence." 28 U.S.C. § 2255(a) (alteration added). Because collateral review is not a substitute for direct appeal, the grounds for collateral attack on final judgments under § 2255 are extremely limited. *See United States v. Frady*, 456 U.S. 152, 165 (1982). A prisoner is entitled to relief under § 2255 if the court imposed a sentence that (1) violated the Constitution or laws of the United States; (2) exceeded its jurisdiction; (3) exceeded the maximum sentence authorized by law; or (4) is otherwise subject to collateral attack. *See* 28 U.S.C. § 2255(a); *see also McKay v. United States*, 657 F.3d 1190, 1194 n.8 (11th Cir. 2011) (citation omitted). "[R]elief under 28 U.S.C. § 2255 is reserved for transgressions of constitutional rights and for that narrow compass of other injury that could not have been raised in direct appeal and would, if condoned, result in a complete miscarriage of justice." *Lynn v. United States*, 365 F.3d 1225, 1232 (11th Cir. 2004) (quoting *Richards v. United States*, 837 F.2d 965, 966 (11th Cir. 1988)).

*Ineffective Assistance of Counsel*. To prevail on a claim of ineffective assistance of counsel, a petitioner must demonstrate both (1) that counsel's performance was deficient, and (2) a reasonable probability that the deficient performance prejudiced the defense. *See Strickland v. Washington*, 466 U.S. 668, 687, 694 (1984); *see also Harrington v. Richter*, 562 U.S. 86, 104 (2011). To satisfy the prejudice prong, a petitioner must establish that, but for counsel's deficient performance, the outcome of the proceeding would have been different. *See Strickland*, 466 U.S. at 694; *see also Lockhart v. Fretwell*, 506 U.S. 364, 369-70 (1993); *Allen v. Sec'y, Fla. Dep't of Corr.*, 611 F.3d 740, 754 (11th Cir. 2010). If a petitioner fails to establish one of the prongs under *Strickland*, the Court need not address the remaining prong. *See Strickland*, 466 U.S. at 697.

A petitioner bears the burden of proof in habeas proceedings. *See Blankenship v. Hall*, 542 F.3d 1253, 1270 (11th Cir. 2008). "'There is a strong presumption that counsel's performance was reasonable and adequate.' To overcome that presumption, 'a petitioner must establish that no competent counsel would have taken the action that his counsel did take.'" *Gordon v. United States*, 518 F.3d 1291, 1301 (11th Cir. 2008) (quoting *Michael v. Crosby*, 430 F.3d 1310, 1320 (11th Cir. 2005); *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000)).

## III. DISCUSSION

In his Motion, Petitioner raises one claim of ineffective assistance of counsel and one claim of actual innocence and insufficient evidence. ECF No. [1] at 4-6; ECF No. [1-1] at 1-13. Construing the Motion liberally, *see Haines*, 404 U.S. at 520-21, Petitioner's sole ineffective assistance of counsel claim raises several separate subclaims in support of relief. ECF No. [1-1] at 1-8. The Court turns to each claim and subclaim in turn.

### A. Claim One

In Claim One, Petitioner alleges that counsel was ineffective for: (1) failing to investigate 184 untraced checks and failing to determine the identity of the check casher; (2) failing to proffer evidence of claims made in his opening statement; (3) failing to cross-examine co-defendant Jimmy Alexandre; (4) failing to object to the introduction of refund checks not charged in the Indictment; (5) failing to challenge language in the "manner and means" section of the Indictment; (6) failing to communicate a plea offer; and (7) failing to object to the sentencing enhancement under U.S.S.G. § 281.1(b)(11)(A). ECF No. [1-1] at 1-8.

> i.    *Ineffective assistance of counsel for failing to investigate the 184 untraced checks and determine the identity of the check casher*

Agent Bradley Cohen testified that of the 345 tax returns co-defendant Jimmy Alexandre submitted for deceased individuals as a part of the criminal conspiracy, only 161 refund checks

were deposited into the BFS bank account. ECF No. [1-1] at 1; *see* ECF No. [9-13] at 82, 88-89. Petitioner acknowledges that the Government carried the evidentiary burden at trial, but he asserts that his counsel was ineffective for failing to trace the remaining 184 tax refund checks and determine the identity of the check casher. *Id.* at 2-3. Had counsel done this, Petitioner argues that he could have used this information to impeach Agent Cohen's testimony that the checks could not be traced. Because counsel did not conduct any investigation regarding the 184 checks, the jury was left "with the impression that either the [G]overnment wasn't hiding anything, or [Petitioner's] counsel had fulfilled his obligation to conduct a pre-trial investigation." *Id.* at 2 (alterations added). Petitioner contends the lack of investigation prejudiced him, in part, because it led to his conviction and the 184 untraced checks resulted in a higher sentence and restitution obligation. *Id.*

Petitioner's argument is familiar. At trial and on appeal, Petitioner attacked the sufficiency of the evidence, including faulting the Government for not tracing all the fraud proceeds or determining the identity of any individuals who cashed checks from the fraud proceeds. *See* ECF No. [9-16] at 112-13 ("The government admitted that they did not attempt to follow the money in the case. They went so far as to identify the owners of some bank accounts and the rest of it they want you to just sort of figure out from the records without identifying anybody . . . ."); *id.* at 121 ("[T]here's two ways to make the case . . . find the source data . . . or you can follow the money. They didn't do either. They did the most superficial investigation they could possibly do."); *see also United States v. Exavier*, 783 F. App'x 849, 860 (11th Cir. 2019) ("[Petitioner] argues that through this testimony, the [G]overnment improperly represented that it could not trace the remaining 184 refund checks. . . . As Agent Cohen explained, the check copies which he received from SBPTG included checks that 'did not have any data on the back' and others that had 'illegible' data." (alterations added)).

Counsel has no absolute duty to investigate particular facts or, for that matter, a certain line of defense; nor is counsel required to present every nonfrivolous defense. *Chandler v. United States*, 218 F.3d 1305, 1317 (11th Cir. 2000). Here, because the sufficiency of the evidence argument is procedurally barred, Petitioner now charges that his counsel was ineffective for failing to investigate the very same evidence he faulted the Government for not providing at his trial. Petitioner's argument fails.

In support, Petitioner provides only conclusory statements and illusory promises of what counsel's investigation of the 184 untraced checks could have revealed. Petitioner has provided no evidence that any such investigation would have been fruitful. Moreover, Petitioner's focus on the 184 untraced checks ignores the 161 fraudulent returned checks that were deposited into the BFS account, an oversight Petitioner cannot overcome. Given the unchallenged evidence (the 161 fraudulent checks deposited into the BFS account), it is just as likely that counsel made a tactical decision not to investigate the 184 untraced checks in favor of the sufficiency of the evidence defense. *See Scott v. United States*, 890 F.3d 1239, 1258-59 (11th Cir. 2018) ("[T]rial counsel has not performed deficiently when a reasonable lawyer could have decided, under the circumstances, not to investigate or present particular evidence." (citations omitted)).

Even if counsel had traced the 184 checks and identified the check casher, there is no indication that such evidence would be exculpatory. Petitioner's argument to the contrary is nothing more than unsupported speculation. Accordingly, counsel was not deficient for failing to investigate the 184 untraced checks and the speculative nature of the claim precludes a finding of prejudice. Because Petitioner has not satisfied his burden on either the performance or prejudice prong of *Strickland*, he is not entitled to relief.

> ii.    *Ineffective assistance of counsel for departing from arguments made in his opening statement and for failing to cross-examine co-defendant Jimmy Alexandre*

Petitioner's next argument highlights the alleged discrepancies between counsel's opening statement and his defense strategy for the remainder of trial. ECF No. [1-1] at 3. In his opening statement, counsel characterized Petitioner as a businessman—"[Petitioner] owns half a dozen businesses including a restaurant, a nightclub, check cashing store, tax preparer service, EFIN service." *Id.* (alteration added); ECF No. [9-9] at 26. He stated that Petitioner had 17 tax preparers working for him, and in a passing comment, mentioned that Alexandre was one of the 17 tax preparers but clarified that they were not "close friend[s]." *Id.* (alteration added); ECF No. [9-9] at 27. Petitioner argues that counsel failed to introduce any evidence of the "17 tax preparers[, including Alexandre,] working in his EFIN business." *Id.* at 4; ECF No. [9-9] at 26-27.[4]

An opening statement is not evidence. "The purpose of an opening statement is to tell the jury what the case is about and to outline the proof." *United States v. Breedlove*, 576 F.2d 57, 60 (5th Cir. 1978). Decisions regarding opening statements are trial tactics based on strategies that are reasonable at the time. *See Harrington*, 562 U.S. at 107 ("Counsel was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies.").

Here, Petitioner's contention that counsel did not present evidence of his businesses and employees in order to suggest other culprits is inaccurate. Counsel asked Leonie Pascoe if she was familiar with Antonio Duval, "one of the tellers for [Petitioner] at the check cashing store." ECF No. [9-13] at 35 (alteration added). Counsel also questioned Agent Cohen using a 2008 BFS company directory listing eight employees. *Id.* at 142.

---

[4] Petitioner also faults counsel for not mentioning Antonio Duval in his opening statement and then changing strategy mid-trial to implicate Duval. ECF No. [1]1 at 4. This claim will be discussed in a separate section.

Moreover, "[s]olemn declarations in open court carry a strong presumption of verity." *Blackledge v. Allison*, 431 U.S. 63, 74 (1977) (alteration added). At the close of evidence, the District Court colloquized Petitioner on his decision not to testify and his satisfaction with counsel's representation:

> THE COURT:      And are you satisfied with [counsel] and the way that he has
>                 represented you throughout this entire case?
>
> [PETITIONER]:   Yes, sir.

ECF No. [9-16] at 77-78 (alterations added). Accordingly, the record refutes Petitioner's claims and thus he cannot overcome his heavy burden.

In his next related argument, Petitioner claims counsel was ineffective for not cross-examining Alexandre. ECF No. [1-1] at 4. Petitioner cites two ways in which counsel's failure to cross-examine Alexandre was ineffective: (1) Counsel did not seek to prove the statements he made about Alexandre in his opening statement through cross-examination; and (2) Counsel failed to cross-examine Alexandre on Antonio Duval and the real identity of Crazy C. The latter reason will be discussed in the next subsection.

The decision to cross-examine a witness and the manner in which it is conducted are tactical decisions "well within the discretion of a defense attorney." *Fugate v. Head*, 261 F.3d 1206, 1219 (11th Cir. 2001) (quoting *Messer v. Kemp*, 760 F.2d 1080, 1090 (11th Cir. 1985)). In order to establish prejudice, a habeas petitioner must show at least one "specific instance where cross-examination arguably could have affected the outcome . . . of the trial." *Id.* (quoting *Messer*, 760 F.2d at 1090); *see Nixon v. Newsome*, 888 F.2d 112, 115-16 (11th Cir. 1989) (finding ineffective assistance where counsel failed to impeach the key prosecution witness with prior inconsistent testimony where the earlier testimony was much more favorable to the defendant).

Ineffective assistance, however, will not be found merely because other testimony might have been elicited from witnesses. *Foster v. Dugger*, 823 F.2d 402, 406 (11th Cir. 1987).

Alexandre admitted during his testimony to preparing tax returns for 345 deceased individuals that would later be flagged as fraudulent. ECF No. [9-14] at 142-55. Alexandre maintained that he did not know that the tax returns he e-filed were for deceased individuals. *Id.* at 154; *see id.* at 144-48. He explained that he struck a deal with Crazy C. *Id.* at 138. Crazy C told him that he had 1,000 tax clients but had lost his EFIN. *Id.* at 135-36. He told Alexandre that for a share of the tax preparation fee, he would provide him with complete client case files to e-file using his PTIN and Mr. Cash's EFIN. *Id.* at 140, 143-46. Alexandre agreed and received permission from the owner of Mr. Cash, Yanel Laroche, to file the tax returns from Crazy C. *Id.* at 138-39. Once the refund checks were issued, Alexandre signed for the checks and delivered them to Crazy C and returned the client case files. *Id.* at 153. No part of Alexandre's testimony implicated Petitioner. *See id.* at 128-76; ECF No. [9-15] 4-55. Alexandre denied conspiring with Petitioner and the co-defendant Maurice in filing the fraudulent tax returns. *Id.* at 154.

Following Alexandre's testimony, particularly his testimony that he did not know Petitioner, it was reasonable for counsel not to impeach Alexandre on this fact. Eliciting testimony from Alexandre that he worked directly with Petitioner as a tax preparer for BFS may have damaged Alexandre's credibility. Indeed, establishing a direct connection between Petitioner and Alexandre would have certainly harmed the defense strategy of insufficient evidence to convict. Counsel's decision not to cross-examine Alexandre on his professional relationship with Petitioner, thereby abandoning the remarks made in his opening statement, was reasonable.

Furthermore, none of Alexandre's testimony implicated Petitioner. *See Provenzano v. Singletary*, 148 F.3d 1327, 1332 (11th Cir. 1998) ("In order to show that an attorney's strategic choice was unreasonable, a petitioner must establish that no competent counsel would have made

such a choice."). Moreover, Petitioner has not pointed to any specific instance where counsel failed to impeach Alexandre and that failure would have changed the outcome of the trial. Thus, this claim is without merit.

> iii.    *Ineffective assistance of counsel for failing to investigate Antonio Duval and Carl "Crazy C" Fertilien as alternative perpetrators and counsel's failure to cross-examine Alexandre on Duval and Fertilien*

In a related claim, Petitioner faults counsel for not investigating the real identity of Crazy C. He asserts that Alexandre was "the one who [knew] 'Crazy C', the one who prepared the tax returns, and claimed that he gave the checks back to the mysterious 'Crazy C'." *Id.* In the Petition, for the first time, Petitioner alleges that during the trial Alexandre told him Crazy C's real name was Carl Fertilien but that he could not tell his own attorney because he had already lied about not knowing the real identity of Crazy C. ECF No. [1-1] at 5; *but see* ECF No. [9-14] at 156 (cross-examination of Alexandre) ("I do not recall [Crazy C's full name]. I do believe – and I may have asked him and I believe he had referred to [sic] as Christopher Charles. And the reason why I say that is because I figured that's where that Crazy C come from because there was a lot of C['s]." (alterations added)). Petitioner states he immediately informed his counsel, but counsel declined to cross-examine Alexandre with this information. *Id.* at 4-6; ECF No. [13] at 6-7.

Additionally, Petitioner claims that despite "possess[ing] all the evidence . . .and [being] well aware of Mr. Duval's role in [Petitioner's] business months before trial," counsel was ineffective for failing to conduct an investigation into Duval. *Id.* at 4 (alterations added). Notwithstanding the fact that counsel allegedly did not investigate Duval, Petitioner faults counsel for not naming Duval in his opening statement, only to later point the finger at Duval as a possible alternative perpetrator. *Id.* Petitioner argues that because counsel had not investigated Duval, his mid-trial decision to pivot to Duval as an alternative culprit was unreasonable. *Id.*; ECF No. [13] at 7.

The Eleventh Circuit has observed that "'omissions are inevitable' because 'trial lawyers, in every case, could have done something more or something different.'" *Scott v. United States*, 890 F.3d 1239, 1258 (11th Cir. 2018) (quoting *Chandler*, 218 F.3d at 1313)). "To avoid being branded ineffective, defense lawyers need not assert every nonfrivolous defense." *Rogers v. Zant*, 13 F.3d 384, 388 (11th Cir. 1994). Further, "as the Supreme Court has stressed, . . . good advocacy requires the winnowing out of some arguments in favor of stressing others: multiplicity of arguments or defenses hints at the lack of confidence in any one." *Id.* (citing *Jones v. Barnes*, 463 U.S. 745, 751-53 (1983) (alterations added).

Here, Petitioner's contention that counsel changed defense strategies mid-trial is incorrect. In Petitioner's defense, counsel consistently argued that the Government's investigation was incomplete and its evidence was insufficient to prove its case. *See* ECF No. [9-9] at 23-24,27, 29; ECF No. [9-16] at 107, 112-13, 116, 121. Part of this strategy was to highlight the fact that the Government never investigated Duval even though in 2011 his name appeared on a number of negotiated checks written from Exavier's personal account and a BFS business account. ECF No. [9-15] at 108, 118-23; ECF No. [9-16] at 116, 123; *see* ECF No. [9-13] at 35-36.

Although Petitioner faults counsel for changing defense strategies mid-trial, Petitioner himself fails to clearly articulate a cohesive alternative defense that counsel should have investigated and presented at trial. Petitioner's arguments regarding Duval are contradictory. He calls counsel ineffective for not investigating Duval, ECF No. [1-1] at 6, while also acknowledging that counsel admitted evidence and made arguments that unbeknownst to Petitioner, Duval orchestrated the conspiracy, *id.* at 4. As to Crazy C/Fertilien, Petitioner puts forward "new evidence" that Crazy C is the younger brother of Luczor Fertilien. *See* ECF No. [13-1]; ECF No.

[14].[5] Petitioner then suggests that Duval may have been the "inside connection" in his check cashing store before proposing the following unanswered question: "Did Antonio Duval, Jimmy Alexandre and 'Crazy C' concoct the perfect conspiracy and frame [Petitioner] for it?" ECF No. [1-1] at 5 (alterations added).

Petitioner's statements inculpating Duval and Crazy C, and his revelation of the identity of Crazy C, are speculative at best. Regarding Duval, Petitioner fails to show what an investigation into him would have produced. The evidence at trial that counsel did submit showing large sums of money negotiated to Duval occurred months after the relevant conduct in the Indictment. ECF No. [9-15] at 115-150. Even if Petitioner could demonstrate that Duval was an employee and involved in the conspiracy, that alone would not exculpate Petitioner particularly where he had signing authority over the BFS accounts in which the illicit funds were deposited.

The same logic applies with equal force to Crazy C. Petitioner's allegation that Crazy C is actually an individual named Carl Fertilien is wholly conclusory. And regardless, even if true, it would not contradict the evidence presented at trial that in early 2011, 470 fraudulent tax returns for deceased individuals were e-filed through Petitioner's two tax-filing businesses, ATAS and ATAS2. ECF No. [9-13] at 75-76, 77-82. Accordingly, even under the most liberal construction, Petitioner's arguments do not establish prejudice. These subclaims are without merit.

 iv.   *Ineffective assistance of counsel for failing to object to the introduction of refund checks not charged in the Indictment*

Petitioner argues that counsel was ineffective for failing to object to testimony regarding 491 tax refund checks that were deposited into the BFS bank account. ECF No. [1-1] at 6; *see* ECF No. [9-13] at 90-91. The 491 refund checks were not associated with returns prepared by

---

[5] Petitioner asserts that in 2017 an individual named Luczor Fertilien pled guilty to "identity theft and filing tax returns for deceased individuals." ECF No. [1-1] at 5 (citing *Fertilien v. United States*, No. 17-cr-60058 (S.D. Fla. Sept. 22, 2017)).

Alexandre nor were they implicated in the Indictment. *Id.* The jury was not shown associated tax returns nor was it told the identity of the multiple tax preparers responsible for the refund checks. *Id.* Petitioner claims that counsel's failure to object or contextualize the 491 refund checks gave the Government an unfair advantage, caused bias, and tainted the jury. *Id.*

"The widespread use of the tactic of attacking trial counsel by showing what 'might have been' proves that nothing is clearer than hindsight-except perhaps the rule that we will not judge trial counsel's performance through hindsight." *Chandler*, 218 F.3d at 1316-17 (quoting *Waters v. Thomas*, 46 F.3d 1506, 1511 (11th Cir. 1995)). First, Petitioner does not explain what objection counsel should have made. Next, Petitioner's argument is internally contradictory with Petitioner's arguments elsewhere in the Petition that counsel abandoned his opening statement by failing to produce evidence regarding Petitioner's legitimate business operations. The jury could have drawn an inference that some of the 491 checks were evidence of BFS's legitimate check-cashing business. Thus, Petitioner cannot, on the one hand, say counsel was ineffective for failing to make arguments about Petitioner's legitimate business operations while, on the other hand, faulting counsel for failing to object to the admission of the 491 refund checks.

Neither can Petitioner show prejudice. In the Government's case-in-chief, counsel proceeded to question Agent Cohen about the 491 refund checks, contending that they were evidence of a "legitimate" check-cashing business and critiquing the Government for not tracking down and interviewing any of the 491 check holders. ECF No. [9-15] at 93-96. Though perhaps not completely fruitful, the line of questioning was aligned with counsel's theory of defense that the Government did not "follow the money" and that its investigation was "superficial." *See* ECF No. [9-16] at 121. Accordingly, this subclaim is without merit.

>   *v.*     *Ineffective assistance of counsel for failing to communicate a plea offer*

Petitioner alleges that his counsel failed to communicate a plea offer. ECF No. [1-1] at 6-7. On January 13, 2016, at Petitioner's initial appearance following his arrest, Magistrate Hunt ordered that attorney Mark Douglas serve as temporary counsel for Petitioner for purposes of his arraignment and bond hearing. CR-ECF No. [12]; CR-ECF No. [21]. On February 9, 2016, Kevin Kulik filed a motion to substitute himself for Douglas as counsel for Petitioner. CR-ECF No. [48]. The District Court granted the motion and Kulik served as counsel for Petitioner at trial, sentencing, and, along with Ashley D. Kay, on appeal. CR-ECF No. [49]; *see* ECF No. [1-2] at ¶¶ 2-3, 5.

Petitioner alleges that dating back to the time of his arrest, he repeatedly asked his counsel if the Government had extended any plea offers. ECF No. [1-2] at ¶ 4; ECF No. [1-1] at 7. Counsel, both Douglas and Kulik, repeatedly told him there was no plea offer. *Id.* Petitioner states that after his sentencing hearing, his older brother Wuddens Exavier, "approached Attorney Mark Douglas in which Mr. Douglas informed him that [Petitioner] was offered a plea for a much lesser prison term but turned it down." *Id.* at ¶ 6 (alterations added). One week before the oral arguments for Petitioner's direct appeal, he asked Kay if there had been any plea offers before trial. *Id.* at ¶ 5; ECF No. [1-1] at 7. Kay responded that "she was not sure and would have to check." *Id.* Petitioner states that had either counsel of record informed him of the Government's plea offer, there is a "strong probability" that he would have accepted the offer. *Id.* at ¶ 9. For its part, the Government denies that a plea offer was ever extended to Petitioner. ECF No. [9] at 9, 20.

Ineffective assistance of counsel claims in the plea-bargaining context are governed by *Missouri v. Frye*, 566 U.S. 134, 140 (2012) (citation omitted). In *Frye*, the Court specifically held that counsel has a "duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused," and that, in general, where such an

offer is not communicated to the defendant, counsel "[does] not render the effective assistance the Constitution requires." *Id.* at 145 (alteration added); *In re Perez*, 682 F.3d 930, 932 (11th Cir. 2012) (per curiam). To demonstrate prejudice, a petitioner must show that, but for the ineffective assistance of counsel, a reasonable probability existed that "he would have accepted the lapsed plea but also a reasonable probability that the prosecution would have adhered to the agreement and that it would have been accepted by the trial court." *Id.* at 150 (alteration added).

Petitioner can show neither. To start, Petitioner's allegation is based on double hearsay— he avers that following sentencing, Douglas made a statement to his brother that Petitioner rejected a plea bargain. Petitioner's allegation is not credible. Moreover, had any deal been extended, Petitioner has not demonstrated that a reasonable probability exists he would have accepted the plea offer. Throughout the trial, Petitioner has adamantly, both on the record at sentencing and throughout the instant Petition, maintained his innocence. *See* ECF No. [1-1] at 9-13; CR-ECF No. [188] at 26-30. The Government avers that it had no basis "to extend any plea offer to a defendant unwilling to admit guilt and apparently unable to meet the most basic requirement for a Rule 11 plea colloquy." ECF No. [9] at 20. Accordingly, this subclaim is without merit. *See United States v. Laetividal-Gonzalez*, 939 F.2d 1455, 1465 (11th Cir. 1991), *overruling on other grounds recognized by United States v. Young*, 975 F.3d 1537, 1540 (11th Cir. 1992) (explaining that where a petitioner fails to establish that counsel's performance prejudiced him, the Court need not conduct an evidentiary hearing).

> vi.   *Ineffective assistance of counsel for failing to challenge the language in the "manner and means" section of the Indictment*

Petitioner next argues that counsel was ineffective for failing to file a motion to dismiss the Indictment. ECF No. [1-1] at 7. He asserts that it was a "void indictment" and counsel should have challenged it on the basis of "duplicity, or doubleness" and because it "did not charge a

specific offense but left it uncertain." *Id.* Petitioner identifies the following sentence from the Indictment as problematic: "[PETITIONER], CARLINE MAURICE, and JIMMY ALEXANDRE submitted or caused the submission, by means of electronic filing, of tax returns in the names of deceased individuals which contained false and fraudulent claims for refunds in the form of a RAC." CR-ECF No. [3] ¶ 9 (alteration added).

An Indictment "is sufficient if it (1) presents the essential elements of the charged offense, (2) notifies the accused of the charges to be defended against, and (3) enables the accused to rely upon a judgment under the indictment as a bar against double jeopardy for any subsequent prosecution for the same offense." *United States v. Chalker*, 966 F.3d 1177, 1190 (11th Cir. 2020) (citing *United States v. Woodruff*, 296 F.3d 1041, 1046 (11th Cir. 2002)). A count in an Indictment is duplicitous if it charges two or more separate and distinct offenses. *United States v. Schlei*, 122 F.3d 944, 977 (11th Cir. 1997).

Here, Petitioner's argument that the Indictment was void is unclear and lacks any legal support. Petitioner does not explain how the Indictment sets forth two separate and distinct crimes as opposed to one crime with alternative predicates. *United States v. Cannon*, 987 F.3d 924, 950 n.14 (11th Cir. 2021). Thus, counsel is not ineffective for failing to raise a meritless issue. *Brownlee v. Haley*, 306 F.3d 1043, 1067 (11th Cir. 2002). This subclaim fails.

vii.  *Ineffective assistance of counsel for failing to challenge sentencing enhancement under U.S.S.G. 281.1(b)(11)(A)*

In a one-sentence subclaim, Petitioner argues counsel was ineffective for not "properly" challenging the sentencing enhancements, "especially the authentication feature enhancement under U.S.S.G. 281.1(b)(11)(A)." ECF No. [1-1] at 8. Petitioner states that at trial and on appeal "counsel failed to address the distinction between subsection (A) and (B)." *Id.* However, Petitioner does not identify any legal arguments his counsel should have raised at trial or on appeal. The

Court will not construct an argument for a *pro se* petitioner. Accordingly, Petitioner is not entitled to any relief based on such conclusory assertions. *See Price v. Allen*, 679 F.3d 1315, 1325 (11th Cir. 2012) (denying habeas relief based on ineffective assistance of counsel where the petitioner provided only conclusory assertions).

### B. Claim Two

In Claim Two, Petitioner argues he is "innocent" of the aggravated identity theft convictions in counts 18-24 of the Indictment. ECF No. [1-1] at 9. He argues that under *Flores-Figueroa v. United States*, 556 U.S. 646 (2009), there was insufficient evidence adduced at trial to prove he had the "requisite knowledge" element. *Id.* The Government asserts that this claim is procedurally defaulted because it was not raised on direct appeal. ECF No. [9] at 24. In his Reply, Petitioner does not contest that the claim is procedurally defaulted. The Court agrees.

"A claim not raised on direct appeal is procedurally defaulted unless the petitioner can establish cause and prejudice for his failure to assert his claims on direct appeal." *McCoy v. United States*, 266 F.3d 1245, 1258 (11th Cir. 2001) (citation omitted). "This rule generally applies to all claims . . . ." *Lynn v. United States*, 365 F.3d 1225, 1234 (11th Cir. 2004) (per curiam) (citations omitted).

"A [petitioner] can avoid a procedural bar only by establishing one of the two exceptions to the procedural default rule." *Id.* (alteration added). "Under the first exception, a [petitioner] must show cause for not raising the claim of error on direct appeal and actual prejudice from the alleged error." *Id.* (citing *Bousley v. United States*, 523 U.S. 614, 622 (1998)). Under the second exception, the petitioner must show that he is "actually innocent." *Id.* at 1234-35 (citations omitted).

"The 'cause' excusing the procedural default must result from some objective factor external to the defense that prevented the prisoner from raising the claim and which cannot be fairly attributable to his own conduct." *McCoy v. Newsome*, 953 F.2d 1252, 1258 (11th Cir. 1992)

(citation omitted). A petitioner may show cause "where a [] claim is so novel that its legal basis is not reasonably available to counsel[.]" *Reed v. Ross*, 468 U.S. 1, 16 (1984) (alterations added). "In contrast, a claim is not novel when counsel made a conscious choice not to pursue the claim on direct appeal because of perceived futility, or when the building blocks of the claim were available to counsel." *United States v. Bane*, 948 F.3d 1290, 1297 (11th Cir. 2020) (citations omitted). "Attorney ignorance or inadvertence is not 'cause' because the attorney is the petitioner's agent when acting, or failing to act, in furtherance of the litigation, and the petitioner must bear the risk of attorney error." *Coleman v. Thompson*, 501 U.S. 722, 753 (1991) (citations and internal quotations marks omitted). However, "[a]ttorney error that constitutes ineffective assistance of counsel is cause." *Id.* at 753-54 (1991) (alteration added); *see also Martinez v. Ryan*, 566 U.S. 1, 11 (2012) (citations omitted).

None of these exceptions is present here. Other than indicating that his counsel did not raise the claim on direct appeal and maintaining his innocence, Petitioner does not address the cause and prejudice standard. ECF No. [1-1] at 24-26.

Counsel's errors on direct review may provide cause to excuse a procedural default. Nonetheless, Petitioner has not alleged any such error. *See* ECF No. [1] at 6 ("My attorney failed to raise the issue."); *see also Holsey v. Warden*, 694 F.3d 1230, 1256 (11th Cir. 2012) (explaining that petitioners bear the burden of proof on ineffectiveness claims).

Nor has the Petitioner shown actual innocence. "To establish actual innocence, petitioner must demonstrate that, in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him." *Bousley*, 523 U.S. at 623 (citation omitted). "[A]ctual innocence means factual innocence, not mere legal insufficiency." *Id.* (citation omitted). Thus, "[t]he habeas court must make its determination concerning the petitioner's innocence in light of all the

evidence." *Schlup v. Delo*, 513 U.S. 298, 328 (1995) (alterations added; internal quotation marks omitted).

Here, aside from maintaining his innocence and asserting the same factual arguments already presented, Petitioner's argument for relief is premised solely upon a legal insufficiency. He argues that the Government failed to prove the knowledge element of aggravated identity theft because it failed to provide evidence "of the manner in which he obtained the victim's identification." ECF No. [1-1] at 9; *see Mize v. Hall*, 532 F.3d 1184, 1195 (11th Cir. 2008) (finding that petitioner bears the burden of "establish[ing] actual innocence under the fundamental miscarriage of justice exception to the procedural default doctrine" (alteration added)). As such, Petitioner has not established his actual innocence to overcome the procedural default of this claim.

## IV. EVIDENTIARY HEARING

In a habeas corpus proceeding, the burden is on the petitioner to establish the need for an evidentiary hearing. *See Chavez v. Sec'y, Fla. Dep't of Corr.*, 647 F.3d 1057, 1060 (11th Cir. 2011). "[I]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007); *see also Jones v. Sec'y, Fla. Dep't of Corr.*, 834 F.3d 1299, 1318-19 (11th Cir. 2016). Here, the issues presented can be resolved based on the record before the Court. Indeed, because the Court can "adequately assess [Petitioner's] claim[s] without further factual development[,]" Petitioner is not entitled to an evidentiary hearing. *Turner v. Crosby*, 339 F.3d 1247, 1275 (11th Cir. 2003).

## V. CERTIFICATE OF APPEALABILITY

A prisoner seeking to appeal a district court's final order denying his or her petition for writ of habeas corpus has no absolute entitlement to appeal; rather, in order to do so, they must obtain a certificate of appealability. *See* 28 U.S.C. § 2253(c)(1); *see also Harbison v. Bell*, 556

U.S. 180, 183 (2009). This Court should issue a certificate of appealability only if Petitioner makes "a substantial showing of the denial of a constitutional right." *See* 28 U.S.C. § 2253(c)(2). Where the district court rejects a petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). However, when the district court rejects a claim on procedural grounds, the petitioner must show that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.* Petitioner fails to make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Upon consideration of the record, the Court concludes that no certificate of appealability shall issue.

## VI.   CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Petitioner Maurice Exavier's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody, **ECF No. [1]**, is **DENIED**.

2. No certificate of appealability shall issue.

3. To the extent not otherwise disposed of, any pending motions are **DENIED AS MOOT** and all deadlines are **TERMINATED**.

4. The Clerk of Court is directed to **CLOSE** this case.

Case No. 20-cv-62172-BLOOM

**DONE AND ORDERED** in Chambers at Miami, Florida, on October 27, 2021.

_____
**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record

Maurice Exavier
#12300-104
Federal Correctional Institution
Inmate Mail/Parcels
Post Office Box 779800
Miami, FL 33177
PRO SE